28 C.C.P.A.(Patents)

## McCORMICK v. MALHERBE.

### Patent Appeals No. 4393.

Court of Customs and Patent Appeals.
Jan. 6, 1941.

Charles L. Stokes, of Los Angeles, Cal. (Henry H. Snelling, of Washington, D. C., of counsel), for appellant.

Busser & Harding, of Philadelphia, Pa. (Frank S. Busser and Hayward H. Coburn, both of Philadelphia, Pa., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office in which it, in part, reversed the decision of the Examiner of Interferences and awarded priority of invention defined by counts 2, 5 and 6 to the party Malherbe.

On May 3, 1938, patent No. 2,116,208 issued to Malherbe on an application filed May 28, 1936, and on July 6, 1938, Mc-Cormick filed his application, serial No. 217,657, in which he copied six claims of the Malherbe patent. McCormick based

his right to contest priority upon a previously filed application, No. 50,206, of November 16, 1935. Preliminary statements were filed and Malherbe's claimed date of conception being after McCormick's filing date, Malherbe was placed under order to show cause why judgment on the record should not be entered against him. No one sought to take testimony at any time when the matter was before the Examiner of Interferences. Appellant in this court raises the issue that the board erred in declining to remand the case for the purpose of taking testimony.

In attempting to show why judgment should not be entered against him, Malherbe brought a motion to dissolve. The ground of said motion with which we are here concerned is that McCormick's original application No. 50,206 did not disclose the invention defined by the counts.

The Primary Examiner denied the motion, the Examiner of Interferences entered the formal award in favor of McCormick, and Malherbe appealed to the Board of Appeals. The board affirmed the decision of the Examiner of Interferences in awarding priority of invention as to counts 1, 3 and 4 to McCormick and from this action no appeal was taken by Malherbe. It reversed the action of the Examiner of Interferences in awarding priority to McCormick of the invention defined by counts 2, 5 and 6 and awarded priority in the same to the party Malherbe, and it is from the last-stated action on the part of the board that McCormick has here appealed.

Counts 2, 5 and 6 follow:

"2. The hereinbefore described process of purifying a cracked petroleum hydrocarbon oil which comprises subjecting a flowing stream of oil to a multiple-stage refining treatment, one stage comprising mixing with the oil a straight run sulfuric acid sludge to form a mixture of partially purified oil and cracked acid sludge and separating the oil from the cracked acid sludge, and a later stage comprising mixing and reacting with the partly purified oil fresh sulfuric acid and separating the resultant mixture of purified oil and acid sludge.

"5. The herein described process of purifying a cracked hydrocarbon oil which comprises subjecting a straight run hydrocarbon oil fraction to treatment with sulfuric acid and separating therefrom the resultant acid sludge, intimately mixing and reacting the cracked hydrocarbon oil with said sludge, separating the acid sludge product of the last named treatment from the cracked oil, and subsequently mixing and reacting with the partly purified cracked oil fresh sulfuric acid and separating the acid sludge of the last named treatment from the oil.

"6. The hereinbefore described process of purifying a cracked petroleum hydrocarbon oil which comprises preliminarily removing certain impurities including particularly sulfur compounds by mixing and reacting with the cracked oil a straight run sulfuric acid sludge which is deficient in sulfur compounds to thereby take up a large proportion of the sulfur compounds in the cracked oil, separating the acid sludge product from the oil, and subsequently mixing with the partly purified oil sulfuric acid in amount and strength sufficient to take up substantially the remainder of the sulfur compounds and separating the acid sludge from the oil; thereby economically utilizing the straight run acid sludge, economizing in the use of acid, and reducing the tendency to impairment of anti-knock value."

It will be noticed that the invention of the counts, which, as before stated, were taken from the patent to Malherbe, involves the essential steps of a multi-stage refining treatment. One stage consists of treating cracked oil with a "straight run sulfuric acid sludge to form a mixture of partially purified oil and cracked acid sludge" and then separating the oil from the cracked acid sludge. The other stage comprises mixing fresh sulphuric acid with this partly purified oil and then separating the resultant mixture of acid sludge and purified oil.

Hydrocarbon oil products, such as gasoline produced by cracking, contain sulphur and various other undesirable ingredients, the removal of which improves the product in color, odor, and octane rating. In removing such impurities, it is desirable not to destroy certain other elements which contribute to the anti-knock value of the product.

The following is quoted from the Primary Examiner's decision on the motion to dissolve:

"McCormick has disclosed the feature of refining a cracked distillate first with an acid sludge and then with fresh acid. On page 11, lines 16 to 21, McCormick recites

in part the following: 'However, the use of other suitable sludges as, for instance, the acid sludge obtained from the sulphuric acid treatment of straight run gasoline or kerosene, or from other sources, is contemplated * * *'.

"McCormick discloses that acid sludges are considered to have a certain acid value and may be applied to an oil either for the purpose of using up the remaining acid value in the removal of the gum forming unsaturates together with acid soluble sulphur compounds or for the treatment of a relatively light fraction so that the acid sludge is said to act as a dilute acid due to the presence of abstracted organic matter from the previous treatment.

"McCormick's disclosure supports counts 1, 3, and 6, as indicated above. Count 2 calls for the multistage refining treatment which also finds basis in the McCormick's disclosure (see Figure 2). Count 4 differs from count 1 in that it recites as a positive step the treatment of a straight run hydrocarbon oil fraction with sulphuric acid in order to obtain a straight run sulphuric acid sludge to be used for the refining of a cracked hydrocarbon oil. However, McCormick has disclosed the use of an acid sludge obtained from the sulphuric acid treatment of a straight run gasoline, and there is only one way of getting a sulphuric acid sludge from the treatment of a straight run gasoline and that is obvious, simply by treating a straight run gasoline with sulphuric acid. Count 5 is similar to Count 4 and differs from it merely in the additional step of using fresh sulphuric acid. McCormick's disclosure supports count 5 also."

The Primary Examiner found that McCormick disclosed the process of the counts, not only in certain language used, which the examiner quoted, but also in figure 2 of the McCormick drawings.

From a statement made in the examiner's decision, it would seem that the exact invention defined by the counts was not fully understood by him. In referring to it he said: "More specifically the cracked hydrocarbon oil is given a preliminary treatment with an acid sludge followed by treatment with fresh acid." It is more correct to state that specifically the invention consists in separately treating with fresh sulphuric acid a cracked distillate which has been previously treated with a straight run sludge.

We have examined figure 2, relied upon by the examiner, and as we understand it, the fresh acid coming through a proportioning pump into one of the tanks is not admitted to a lighter fraction which had been treated with a straight run sludge, but in figure 2 of the drawings a mixing of fresh acid with a sludge in order to make said acid sludge have a greater acid component is shown.

In the McCormick original specification is found the following:

"It is found that such acid sludge obtained from treating the heavy fraction * * * with high acid rates contains sufficient reactive sulphuric acid to function efficiently for the desulphurization of the light fraction * * * hence a preferred form of the invention includes the supply of acid sludge derived from the treatment of the heavy fraction * *. * for the treatment of the light fraction * * *. [The sludge referred to is a cracked acid sludge.]

    *     *     *     *     *     *

"However, the use of other suitable sludges as, for instance, the acid sludge obtained from the sulphuric acid treatment of straight run gasoline or kerosene, or from other sources, is contemplated herein for the treatment of the light fraction in place of the straight acid treatment, it being understood, of course, that if any of the sludges utilized for this purpose are deficient in acid value for treatment of the light fraction, such sludge can be increased in acid concentration by the addition of a required amount of fresh acid * * *.

"Alternatively, if the acid sludge derived from the heavy fraction is not sufficiently reactive to reduce the sulphur content of the light fraction to a very low figure, the light fraction may be further separately treated with fresh acid at a rate of say up to five pounds per barrel of 98% acid and in accordance with the true countercurrent flow shown in Fig. 2."

The board, in reversing the Examiner of Interferences as to counts 2, 5 and 6, merely made this brief statement: "As to counts 2, 5 and 6, we find that McCormick does not specifically state that he treats with sulphuric acid a cracked distillate that has been previously treated with straight run sludge. We find nothing relative to Fig. 2 of McCormick, referred to in the Primary Examiner's decision, which

specifically discloses the process of these counts."

It will be noticed that the board states that McCormick does not specifically state that he treats a cracked distillate that has been previously treated with a straight run sludge with sulphuric acid. The examiner seemed not to have expressed himself upon the particular point raised by the board.

In the McCormick specification he teaches that he first fractionates the hydrocarbon product and then he treats the cracked heavier fraction and obtains a cracked sulphuric acid sludge therefrom. This is distinguishable from a straight run acid sludge in that in the latter a straight run oil and not cracked oil is treated with acid and a sludge is obtained. In obtaining straight run gasoline no cracking process is involved. McCormick takes the cracked acid sludge which he obtains from the heavier fraction and he uses it to purify the lighter fraction. He states definitely that he may use other sludges "for instance, the acid sludge obtained from the sulphuric acid treatment of straight run gasoline or kerosene." Now, the point made by the board is, as we understand it, that he did not say that he could treat a light cracked fraction with a sludge obtained from the sulphuric acid treatment of straight run gasoline and then afterwards treat the same further with fresh acid. In other words, while he speaks of a cracked distillate that has been previously treated with straight run sludge, he at no point teaches that this particular material may be further separately treated with fresh acid.

It will be noticed that in the quoted language where he "alternatively" refers to further treating the light fraction with fresh acid, he at no place suggests that he further separately treats with fresh acid a light cracked fraction that has previously been treated with a straight run sludge.

Much has been said about what was old in the art and what one skilled in the art would do in performing the McCormick process, but we are not convinced that McCormick has taught one skilled in the art the particular invention defined by the three counts at bar.

■ While the principles laid down by this court in Hansgirg v. Kemmer, 102 F.2d 212, 214, 26 C.C.P.A., Patents, 937, referred to by the board, have some application to the issue involved, the case is not exactly in point with the instant case on the question of inherency, except as applied to figure 2 of the drawings, and with respect to that figure we think the following language in the said Hansgirg v. Kemmer case is pertinent: "Where one copies a claim from an inadvertently issued patent it should clearly appear that his application disclosed the invention either expressly or inherently. [Authorities cited.] He may disclose the invention by drawings, by the use of language, or he may disclose it by reciting and teaching such subject matter as will inherently do the thing or possess the quality which is claimed for it. So it is not enough to say that Kemmer said nothing about dust removal or about a screen which would remove it if the process defined by Kemmer would inherently perform the function in the manner prescribed by the count. Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient. [Authorities cited.] If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient."

■ It is difficult to see how the invention of the counts is inherent in McCormick's application, including original claim 10. Original claim 10 admittedly does not cover the invention at bar. In it is no mention of treating a cracked light fraction with a straight run sludge before treating it with fresh acid.

■ McCormick argues more to the effect that any one carrying out the McCormick teachings and being skilled in the art would, if desirable, separately treat with fresh sulphuric acid a cracked distillate that had been previously treated with straight run sludge. If it were conceded that one skilled in the art "might" do so, we do not think that this fact alone would justify the conclusion that the invention of the counts was disclosed in the McCormick application. Under circumstances like those at bar, for a disclosure to support interference counts, there must be more than a possibility that a certain process will be followed if the teachings are followed. There must be some positive, definite disclosure of the steps of the process, or such a disclosure of steps that if

the teachings are followed by one skilled in the art the process must inevitably result. Hansgirg v. Kemmer, supra; Brand v. Thomas, 96 F.2d 301, 25 C.C.P.A., Patents, 1053.

■ One other question needs consideration here. When Malherbe appealed to the Board of Appeals from the decision of the Examiner of Interferences, the decision on priority as to the invention defined by the six counts there involved was in favor of McCormick. He relied for evidence of priority upon his said earlier filed application and as before stated at no time attempted to take any testimony relating to priority. After the board had reversed the examiner as to counts 2, 5 and 6, and had awarded priority of the invention therein to Malherbe, McCormick filed a request for reconsideration in which he argued that the board was in error in holding that his earlier-filed application did not sufficiently disclose the invention of the three counts in controversy. In this request is contained the following:

"Should the Board still feel on reconsideration that Hansgirg v. Kemmer requires McCormick to 'specifically state' the counts in his specification in spite of the foregoing argument to the contrary, *it is moved that McCormick be given opportunity to take testimony to prove that he reduced the narrower counts to actual practice before the constructive reduction to practice by filing his parent case.* This it is hoped the Board will render unnecessary by awarding all counts to McCormick as urged herein. [Italics ours.]

"Request to take testimony has not heretofore been made as the Patent Office has previously said in effect it is not necessary for McCormick to take testimony as we hold his parent case discloses the invention of counts 1 to 6, inclusive."

We know of no rule or decision of the Patent Office or decision of any court which supports the contention of appellant that under the circumstances at bar the board should have remanded the case or had the right to remand the case for the purpose of affording him the opportunity of taking testimony relating to priority arising from an actual reduction to practice alleged to have occurred prior to his earliest filing date. The only issue before the board was one of priority and that issue had to be decided upon the record before it. Appellant cites no authority in support of his contention.

Whether appellant, during the time when the Examiner of Interferences had jurisdiction of the proceeding, had the right to submit proof relating to an earlier reduction to practice than that relied upon by the Primary Examiner and by the appellant, is beside the question. He made no showing relating to an earlier reduction to practice than that disclosed in his early application and did not seek an opportunity to do so until after the board had decided the case against him. The board committed no error in overruling appellant's said motion to remand.

The decision of the Board of Appeals, awarding priority in the invention defined by counts 2, 5 and 6 to the party Malherbe is affirmed.

Affirmed.