31 C.C.P.A. (Patents)

### PINKERTON et al. v. STAHLY et al.

#### Patent Appeal No. 4912.

Court of Customs and Patent Appeals.
June 26, 1944.

Rehearing Denied Oct. 2, 1944.

---

882

Pennie, Davis, Marvin & Edmonds, of New York City (Louis D. Forward and Clarence M. Fisher, both of Washington, D. C., and Raymond F. Adams, of New York City, of counsel), for appellants.

George J. Silhavy (W. E. Currie and P. L. Young, both of New York City, and W. F. Weigester, of Washington, D. C., of counsel), for appellees.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and JACKSON, Associate Judges.

BLAND, Associate Judge.

Pinkerton and Mendius, the junior party, have here appealed from a decision of the Board of Interference Examiners of the United States Patent Office in an interference proceeding, awarding to Stahly and Hattox, the senior party, priority of the invention defined in count 2 (the only count at issue here). The interference is between appellants' patent No. 2,233,144, granted February 25, 1941, on an application filed October 19, 1939, and appellees' application, Serial No. 248,423, filed December 30, 1938. Appellants being the junior party, the burden was upon them to prove priority by a preponderance of the evidence.

The invention, for the most part, can be understood from a reading of the count involved. It relates to catalytic alkylation for the production of hydrocarbons suitable for use in motor fuels to increase their anti-knock qualities. The specifications of the patent and the application, and the briefs of the parties—especially the brief of appellants—devote much space to highly technical discussions of many phases of the process, which, in view of our conclusion and the narrowness of the issues presented, we need not repeat here.

The appellees copied into their application two claims taken from the said patent of appellants and requested an interference. The interference was originally declared upon but one count, the Primary Examiner then holding that appellees could not make a claim corresponding to the involved count 2. Appellees then moved to amend the issue by adding count 2 and others, which motion was 'opposed by appellants (said opposition being equivalent to a motion to dissolve the interference). The Primary Examiner granted the motion to amend by adding count 2 and denied it as to the other proposed counts, whereupon the interference was redeclared comprising counts 1 and 2.

Neither party took testimony, but the case was submitted to the Board of Interference Examiners on the basis of stipulated evidence. Priority as to count 1, by virtue of facts shown in the stipulation of the parties, was awarded to appellants, and appellees concede the correctness of such holding.

We here quote count 2:

"2. In the manufacture of iso-octane, the improvement which comprises subjecting a hydrocarbon mixture consisting essentially of a major proportion of isobutane and a minor proportion of a butylene component to contact with a phosphoric acid catalyst at a temperature approximating 150°-450° F. under a pressure upwards of about 500 pounds per square inch for a period of time sufficient to effect substantial alkylation, *separating an isobutane fraction from the products of the catalytic condensation and recirculating this isobutane fraction through the region of catalyst contact.*" (Italics ours.)

Count 1 was identical with the unitalicized portion of count 2.

Appellants argued before the Primary Examiner and the board, and argue here, that appellees have no right to make count 2 because it is not supported by the disclosure of their application.

There are two main questions for decision here:

(1) Do appellees have the right to make count 2?

(2) If appellees have the right to make the count, have appellants sustained their burden of proving priority of invention?

The latter involves the question of prior conception on the part of appellants and that of diligence on their part during the critical period.

The record shows that neither party "physically reduced to practice the subject matter defined in count 2 * * * prior to the filing dates of their respective applications directly involved in the present interference." Since appellees took no testimony, they are restricted to their filing date (December 30, 1938) for conception and reduction to practice of the invention in issue.

Beginning in 1937 and continuing through 1938 and 1939, Pinkerton and Mendius were employees of the Development Department of the Sinclair Refining Company (assignee of their patent involved in this interference) and Pinkerton was directly responsible to Mendius. Other parties concerned with the Development Department are referred to in the record and will be referred to hereinafter.

It was stipulated that in November of 1937 Pinkerton and Mendius were in conference with others of the Development Department when the question of the occurrence of alkylation under certain operating conditions was being considered. In April 1938 Pinkerton and Mendius executed an application prepared by one Adams, a member of the patent law firm of Pennie, Davis, Marvin & Edmonds, and the same was filed on April 28, 1938. Patent No. 2,177,579 (not the one in interference) was granted on this application on October 24, 1939. This patent made no mention of the element of the count reciting that the hydrocarbon mixture consists "essentially of a major proportion of isobutane and a minor proportion of a butylene component," as do the specification and claims of the patent herein directly involved. It was stipulated that Adams' attention was called to the fact that the feature of "recirculation of saturates" and the feature of "maintenance of a relatively low concentration of unsaturates" were jointly conceived by Pinkerton and Mendius.

Another application was prepared by said Adams and executed by Pinkerton as the sole inventor. This application was filed on August 11, 1938, and was later abandoned. The filing date of this application was prior to any date to which appellees are entitled. In the sole application, the temperature in the catalytic reaction zone was limited to not more than 250° F., whereas the instant count calls for a temperature of approximately 150° to 450° F.

It is the contention of appellants that the invention of the count involved here, which is a claim of their patent No. 2,233,-144, is the same invention as that of the sole application except that the sole application is narrower in its scope than the joint application, and that the appellants here, in considering the question of priority, are entitled to a date of conception as of the date of the Pinkerton report which furnished the information to Adams in preparing the sole application—that date being much earlier than any date to which appellees are entitled.

It may be said here that the claims of the sole application were rejected on a British patent. Subsequently, Pinkerton filed an affidavit under Rule 75, 35 U.S.C.A. Appendix, and overcame the British patent, but the claims were then rejected on the ground of double patenting over the claims of the patent involved in the instant interference (which had been granted in the meantime) and also on a newly-cited United States patent.

Appellants also contend that under the stipulated record it should be held that the conception was a joint one; that the filing of the application of Pinkerton as sole inventor was a mistake, which was afterwards corrected by the filing of the application for the patent here involved; and that for that reason appellants are entitled to a date for joint conception of the invention at bar as of the date of conception of the invention disclosed in the sole application. It is then contended upon this premise that since appellants were the first to conceive and were diligent until the filing date of the application for the patent here involved, they must be regarded as the first inventors in this priority contest.

We first discuss the issue as to appellees' right to make the count. The Primary Examiner at first held that the appellees' disclosure was insufficient to meet the above-italicized limitation at the end of the count, notwithstanding the fact that

appellees had called to his attention the following language in their application:

"* * * Likewise any unreacted reactants are separated from the desired fraction and returned to the reaction zone. * * *"

Later, appellees called further attention to other language found in their application, reading as follows:

"* * * Any excess of unreacted reactants may be separated from the product in conventional manner and recycled to the feed line to the catalytic reactors. If desired, the recycled reactants may be subjected to a preliminary dehydrogenation and/or polymerization treatment prior to their mixing with the fresh feed."

Upon consideration of the new language cited, the examiner changed his conclusion and held that he must "concur in" appellees' contention that their disclosure supports the count involved in that particular. The examiner then proceeded to determine whether or not the "separated and recycled fraction is an isobutane fraction." He held that it was.

At final hearing before the Board of Interference Examiners, this issue was again raised, and the board had the following to say (drawing numerals omitted):

"An examination of the prior art of record in the involved Pinkerton and Mendius patent, as required by Rules 122 and 130, indicates that the patentability of count 2 (claim 3 of the Pinkerton and Mendius patent) is not dependent upon any special construction of the language used in describing the separating and recirculating steps. Pinkerton and Mendius urge that the Stahly and Hattox application does not contain an adequate disclosure of the separating and recirculating steps.

"In the apparatus shown in the drawing of the Stahly and Hattox application the raw materials for the alkylation reaction are passed through the alkylation reactors * * * and the alkylation product passes through [a] pipe * * * into [a] debutanizer unit * * *. Higher boiling fractions are carried from the debutanizer unit * * * through [a] line * * * while products boiling below a C₅ fraction pass through pipes * * * into a dehydrogenating unit * * * where paraffinic constituents are dehydrogenated. The product of this dehydrogenating step, after separation, is conducted by [a] recycle line * * * into the alkylation feed line * * *. As pointed out by Pinkerton and Mendius * * *, the process illustrated in the Stahly and Hattox drawing would not result in the recirculation of "an isobutane fraction," for the unreacted portion of the product of the alkylation step is dehydrogenated prior to recirculation. However, in the last three lines on page 12 and the first three lines on page 13 of the original Stahly and Hattox application it is stated that 'Any excess of unreacted reactants may be separated from the product in conventional manner and recycled to the feed line to the catalytic reactors. If desired, the recycled reactants may be subjected to a preliminary dehyrogenation and/or polymerization treatment prior to their mixing with the fresh feed.' It is seen that the Stahly and Hattox drawing illustrates the optional method disclosed in the second sentence quoted above and does not show the procedure wherein unreacted reactants are separated from the product and recycled to the feed line. The process not shown in the drawing corresponds to the last two steps in count 2. Page 5, lines 10 and 11, of the Stahly and Hattox application as filed also mentions separation of unreacted reactants from the desired fraction and return of the unreacted reactants to the reaction zone.

"As for the unreacted reactant which is recycled according to the Stahly and Hattox disclosure, it is to be noted that claim 8 of the Stahly and Hattox application as filed specifies the use of isobutylene and isobutane and Examples 6 and 7 and claim 12 as originally filed teach the use of a major proportion of isobutane and a minor proportion of a butylene component. In an operation according to these disclosures, using an excess of isobutane, unreacted reactants in the alkylation product which are separated and recycled would comprise 'an isobutane fraction,' as recited in count 2.

"Pinkerton and Mendius argue that count 2 either refers to some particular manner in which the isobutane fraction is separated and recirculated, in which case the Stahly and Hattox disclosure is inadequate, or it refers to the conventional operation of separating and recirculating, in which case the award of priority as to count 2 must follow the award of priority as to count 1. It is considered clear that the language of count 2 does not require any special method of conducting the separating and

recirculating steps and, as pointed out above, the prior art of record in the Pinkerton and Mendius patent file does not impose any particular limitations on the clear language of the count."

Here we have two Patent Office tribunals passing upon a technical matter with full concurrence of views. Under the settled law, these concurrent findings should not be disturbed unless clearly erroneous. We have given careful consideration to all of appellants' highly technical arguments, but we have not been convinced that the tribunals below were in error in holding that appellees' disclosure supports the count involved. As the board has pointed out, the language is plain and does not involve ambiguity; and we may not read into the count limitations urged by appellants, basing their argument upon what was taught in their patent, a claim of which is the count involved here. The count is not limited to, nor does it specify, any particular manner in which the isobutane fraction is separated and recycled.

In deciding this question, the tribunals below (as far as the record discloses) did not rely upon appellees' drawing of the apparatus which illustrates the method, and it is not necessary for us to do so. This matter is involved in a highly technical discussion of what happens under certain circumstances, and, to say the least, it is not clear that it may be ascertained from the drawing that the separation occurs as prescribed by the count if what appellants disclose in their patent is taken into consideration. We think the broad language above quoted in appellees' application affords sufficient basis to support the limitation in controversy. We therefore hold that no error was committed by the Board of Interference Examiners in holding that appellees have the right to make the count.

We proceed to the question of appellants' conception date. Without going too much into detail, we think the record as a whole does not produce a picture of a mistaken identity as to who first conceived the invention, on the part of him who prepared and those who executed the applications which we are discussing. The board so found.

Several exhibits were introduced by appellants in an effort to show that their conception date should extend to the conception of the invention of the sole application. One of the exhibits, we think, affords sufficient basis for a holding that long after the conception of the invention defined in the sole application, experiments made in the Development Department of the Sinclair Refining Company disclosed the importance of carrying out the method in temperatures ranging well above 250° F., and up to 450° F., and that, this fact having been discovered, a new application was regarded as necessary. In this application, the appellants were regarded as joint inventors.

Appellants' exhibits 5(a), 5(b), 10, and 11 are the only ones we need consider in this connection. Exhibit 5(a) is a photostatic copy of a report prepared by Pinkerton on July 7, 1938, and 5(b) is a photostatic copy of a carbon copy of this report, which was reviewed and initialed by Mendius on or before July 15, 1938. This report discloses the use of a major proportion of isobutane and a minor proportion of butylene, which meets one of the important elements of the count at bar. The temperature prescribed was 250° F. or below. This report also mentions the separation and recycling steps recited in the count.

Exhibit 10 is a letter received by said Adams from Isom, Sinclair's vice-president in charge of research and development. It transmitted a letter dictated and signed by Gardner, using Herthel's name. Gardner was a member of the Development Department of the Sinclair Refining Company and assumed part of the duties of Herthel, who was assistant to the vice-president in charge of research and development. Gardner's letter was dated September 23, 1939, and it refers to the sole Pinkerton application. It calls attention to the upper temperature limit of 250° F. and then continues:

"* * * Recent test data indicates that higher temperatures, of the order of 400° F., are preferable, and since our parent application has a maximum limiting temperature of 450° F, we feel we are entitled to the benefits of our recent findings with respect to temperature. We suggest the matter be referred to Mr. Adams for an opinion.

"We attach copy of Mr. Pinkerton's report of September 18, 1939 which covers the results of our butylene-isobutane alkylation tests at higher temperatures."

Adams thereupon drafted a new application in the name of Pinkerton and Mendius and forwarded it to Herthel with a trans-

mittal letter written and dated October 5, 1939. This letter, which is exhibit 11, contains the following:

"You will note that the substitute application is prepared as for a joint invention of Pinkerton and Mendius instead of for a sole invention of Pinkerton. The original Pinkerton application you will perhaps recall rather emphasized the original liquid phase idea. In enlarging the application to come up to the limits set forth in the parent application it seems to me that the distinction between Pinkerton as the inventor and Pinkerton and Mendius as the inventors tends to disappear and this is my reason for this change. If you disagree with this change, I am going to ask you to tell me how the invention as a sole invention of Pinkerton can be distinguished from the invention of Pinkerton and Mendius now on its way to patent."

The application was executed by Pinkerton and Mendius and was returned to Adams, who filed the same in the Patent Office on October 19, 1939. The patent directly involved in this interference was granted to the appellants on the last-named application.

The board, in considering this question, had the following to say:

"The party Pinkerton and Mendius acknowledges that the sole application of Pinkerton which was filed on August 11, 1938 'probably cannot be treated as a constructive reduction to practice by Pinkerton and Mendius' * * *. The decision of the Commissioner of Patents in Ex parte Benes, 339 O.G. 499, 1925 C. D. 75, indicates that a sole application is not a constructive reduction to practice of a joint invention, and it was held in the case of Wailes Dove-Hermiston Corporation v. Oklahoma Contracting Co., D.C., 48 F.2d 901, affirmed 5 Cir., 56 F.2d 143, 12 U.S.P.Q. 423, that a later filed joint application does not derive a filing date from an earlier filed sole application. It is held that the sole Pinkerton application, Serial No. 224,239, is of no benefit to the joint party Pinkerton and Mendius as a constructive reduction to practice.

"The party Pinkerton and Mendius urges that 'the stipulated evidence shows conception of the subject matter of count 2 by Pinkerton & Mendius at least as early as the middle of July, 1938, and diligence on the part of all concerned in attempting to effect a proper constructive reduction to practice starting at least as early as August 11, 1938 when Serial No. 224,239 was filed' * * *. There is clearly no evidence of any conception by Pinkerton and Mendius prior to the date of Pinkerton and Mendius Exhibit 5(a), for the activities preceding that date either were directed to the subject matter of the first Pinkerton and Mendius application, Serial No. 204,736, thus not involving the use of 'a hydro-carbon mixture consisting essentially of a major proportion of isobutane and a minor proportion of a butylene component,' or they were directed to a procedure which did not involve separation of an isobutane fraction and recirculation of the same.

"It was stipulated that Mendius 'reviewed and initialed' the carbon copy of Pinkerton and Mendius Exhibit 5(a), the initialed copy being in evidence as Pinkerton and Mendius Exhibit 5(b). However, this mere review and initialing of Pinkerton's report by Mendius does not establish a joint conception of the invention in issue by Pinkerton and Mendius. It is noted that Pinkerton was directly responsible to Mendius, but even this fact in connection with the review and initialing previously referred to does not prove that the conception was joint. The unreliability of initialing as an indicia of joint inventorship is illustrated by Pinkerton's report of April 4, 1938 (Pinkerton and Mendius Exhibit 4), which includes three different sets of initials at the top of the first page.

"It is recognized that an application in due form, made by two or more persons claiming to be joint inventor, is prima facie evidence that they are such. Lemp v. Randall and Bates, 33 App.D.C. 430, 1909 C.D. 455, 146 O.G. 255; Beidler v. Caps and Leininger, 36 F.2d 122, 17 C.C.P.A., Patents, 703, 1930 C.D. 78, 392 O.G. 241, 4 U.S.P.Q. 58; Brown v. Edeler et al., 110 F.2d 858, 27 C.C.P.A., Patents, 1091, 1940 C.D. 429, 519 O.G. 222, 45 U.S.P.Q. 181. However, the question raised in the present case is not whether there was a joint invention, but the date when the joint conception of the invention in issue occurred. In the cited cases there was evidence of joint invention, whereas the evidence in the instant case shows only activity by Pinkerton alone during the latter part of 1938 and the early part of 1939. Pinkerton's sole activity is indicated by his single signature on the

report of July 7, 1938 (Pinkerton and Mendius Exhibit 5(a)), Gardner's direction to file the application which later became Serial No. 224,239 in the name of Pinkerton as sole inventor (Pinkerton and Mendius Exhibit 6), the review and criticism of the application papers by Pinkerton alone (Pinkerton and Mendius Exhibit 8) and the subsequent filing thereof in Pinkerton's name. Any possible presumption that all work which meets the terms of count 2 and which was done prior to the filing of the joint application, Serial No. 300,164, was done jointly and on behalf of both joint applicants is disturbed by the fact that there are material points of difference between the sole Pinkerton application, Serial No. 224,239, and the joint Pinkerton and Mendius application, Serial No. 300,164. It may be noted that Gardner's letter of September 23, 1939 (Pinkerton and Mendius Exhibit 10) refers to 'recent test data' and 'recent findings' and Adams' letter of October 5, 1939 (Pinkerton and Mendius Exhibit 11) indicates that there was no recognition of a joint invention until it was decided to expand the temperature and pressure limits disclosed in the sole Pinkerton application (Serial No. 224,239) to correspond to those taught previously in the first joint Pinkerton and Mendius application (Serial No. 204,736). The correspondence which includes Pinkerton and Mendius Exhibits 6, 10 and 11 indicates a deliberate intent to fix Pinkerton as the sole inventor of the specific subject matter of his sole application, Serial 224,239, and to fix Pinkerton and Mendius as the joint inventors of the expanded and enlarged subject matter of their joint application, Serial No. 300,164.

"The stipulation concerning Mendius' review and initialing of Pinkerton's report of July 7, 1938 (Pinkerton and Mendius Exhibit 5(a)) is the best evidence of a *joint* conception of the invention defined in count 2 by Pinkerton and Mendius prior to the filing of the Stahly and Hattox application on December 30, 1938. There is no other evidence of *joint* activity by Pinkerton and Mendius which would warrant awarding to the junior party a date of conception for the invention of count 2 prior to the senior party's filing date."

▮ We are in entire agreement with the board in its holding that, under the circumstances stated, appellants are not entitled to the benefit of the filing date of the sole application, as a joint conception date. It is our view that the record does not show that Mendius was a party to the conception of the invention of the count at bar. The board has pointed out that the initialing of reports under circumstances like these may not be relied upon to show joint conception, especially in view of the fact that the initials of Mendius and of two others were on the report of Pinkerton which culminated in the original joint application of Pinkerton and Mendius (now patent No. 2,177,579).

The facts upon which the determination of this issue depends appear to be essentially these: The original joint application (now patent No. 2,177,579) disclosed broadly the catalytic alkylation of paraffinic hydrocarbons and olefinic hydrocarbons within the temperature range of 200° to 450° F. but made no mention of separation and recirculation of any unreacted reactants, saturates or unsaturates. The sole application of Pinkerton disclosed the catalytic alkylation of a hydrocarbon mixture consisting of a major proportion of isobutane and a minor proportion of a butylene component at a temperature not exceeding about 250° F. and also the separation and recirculation of an isobutane fraction. And the present joint case (patent No. 2,233,-144) discloses the catalytic alkylation of a hydrocarbon mixture consisting of a major proportion of isobutane and a minor proportion of a butylene component within the temperature range of 150° to 450° F. and the separation and recirculation of an isobutane fraction. There is the additional fact that priority as to count 1 has been awarded to appellants on the basis of a reduction to practice prior to September 18, 1937; which means that the only element of count 2 as to which priority must be proved is that relating to the separation and recirculation of an isobutane fraction—of course, in connection with the process recited in the remainder of the count.

The first disclosure of the separation and recirculation of an isobutane fraction was in the Pinkerton report of July 7, 1938 (exhibit 5(b)), which culminated in the filing of the sole Pinkerton application. The subsequent filing of the present joint case was apparently prompted by later tests —the "Recent test data" and "recent find-

888

ings" referred to in Gardner's letter of September 23, 1939 (exhibit 10)—which demonstrated that better results were obtained in the higher temperature range. There is nothing to indicate that the discovery of the separation and recirculation of an isobutane fraction was a joint discovery of Pinkerton and Mendius. On the contrary, the circumstances all point the other way—indicating that it was a discovery of Pinkerton alone. We have already held that the mere review and initialing by Mendius of the Pinkerton report of July 7, 1938, is insufficient to establish a joint conception.

The board, evidently anticipating appeal, took up the question of diligence and held that the diligence of the sole applicant and matters relating to his application were not applicable to the diligence required of appellants as joint inventors. In view of our conclusion that appellants were not the first to conceive the invention defined by the count, it is unnecessary for us to consider this question.

In attacking the sufficiency of appellees' disclosure, appellants rely upon McCormick v. Malherbe, 116 F.2d 520, 28 C.C.P.A., Patents, 838, and Brand v. Thomas, 96 F.2d 301, 25 C.C.P.A., Patents, 1053, urging that appellees' disclosure, under the doctrine laid down in those cases, lacks clarity sufficient to form the basis for the allowance of the count in appellees' application. We do not regard those cases as in point. We cannot see that the instant count, as a claim in appellees' application, would be an "interloper," as characterized the situation in the cited cases.

■ A writ of certiorari was issued by this court upon application duly made by appellees to correct diminution of the record. The added portion consists of approximately four pages of printed matter, covering the subject of an affidavit filed by Pinkerton under Rule 75, which we think was material to the decision of the case, and the cost for printing the same is therefore taxed against the appellants.

From the foregoing it follows that the board properly awarded priority as to the subject matter of the count involved to appellees, and its decision is affirmed.

Affirmed.